IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

DEBORAH D. FINCUS-HATCH                                                                    PLAINTIFF

V.                                              NO. 09-5179

MICHAEL ASTRUE,
Commissioner of Social Security Administration                                    DEFENDANT

**MEMORANDUM OPINION**

Plaintiff, Deborah D. Fincus-Hatch, brings this action pursuant to 42 U.S.C. §405(g), seeking judicial review of a decision of the Commissioner of the Social Security Administration (Commissioner) denying her claims for a period of disability and disability insurance benefits (DIB) under Title II of the Social Security Act (the Act). In this judicial review, the Court must determine whether there is substantial evidence in the administrative record to support the Commissioner's decision. See U.S.C. §405(g).

**Procedural Background**

Plaintiff protectively filed her application for DIB on May 17, 2007, alleging disability since April 20, 2007. (Tr. 109-111,121). Plaintiff's application was denied initially and upon reconsideration. (Tr. 60, 73-75). Pursuant to Plaintiff's request, a hearing was held before an Administrative Law Judge (ALJ) on January 16, 2009, where Plaintiff and a Vocational Expert (VE) appeared and testified. (Tr. 9-59). On May 20, 2009, the ALJ entered her decision, denying Plaintiff's request for a determination of disability. (Tr. 62-72). The ALJ found that Plaintiff had the following severe impairments: cerebrovascular accident and rheumatoid

arthritis. (Tr. 67). However, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments, and after careful consideration of the entire record, found that Plaintiff had the RFC to perform light work with certain limitations. (Tr. 68 ). More specifically, the ALJ found that Plaintiff could only occasionally push and pull with the left upper extremity and occasionally push and pull with both lower extremities; could occasionally balance, stoop, kneel, crouch, and crawl; could not climb ladders, ropes, and scaffolds; could frequently handle with the left upper extremity but only occasionally finger with the left upper extremity; could not have concentrated exposure to extremes of temperature; must have seizure precautions, such as no exposure to unprotected heights and untended machinery and no driving as part of her work. (Tr. 68). The ALJ further found that Plaintiff was capable of performing her past relevant work as a secondary school teacher, light exertional level, skilled. She stated that this work did not require the performance of work-related activities precluded by Plaintiff's RFC. (Tr. 71). (Tr. 71). Plaintiff's request for a review was denied by the Appeals Council on July 14, 2009, and the decision of the ALJ therefore became the final decision of the Commissioner. (Tr. 4-6).

**Evidence Presented**

Plaintiff was born in 1961 and received her Masters degree. (Tr. 14, 109). Plaintiff had performed various jobs since 1987, as an auditor and a substitute teacher, and taught secondary school from 1999 to 2003. Thereafter, she and her husband had an embroidery business they ran from their home until 2007, when Plaintiff allegedly became disabled. (Tr. 25-26, 154).

In March of 2007, Plaintiff presented herself to the Conway Regional Health System emergency department complaining of chest pain. (Tr. 198). Upon having a coronary

angiography, she was found to have occlusion of a side branch of the first obtuse marginal vessel. (Tr. 202). An electrocardiogram gave rise to an impression of acute myocardial infarction. (Tr. 197). She was started on an Ace inhibitor and beta blocker, and was instructed to follow up with Dr. David Churchill in Fayetteville, a cardiologist she had seen in the past. (Tr. 194).

On April 6, 2007, Plaintiff saw Dr. Churchill for evaluation of coronary artery disease. Although she was not having any further chest discomfort at that time, she was having some pain over the left scapula, which had been present since she was admitted to the Conway hospital. (Tr. 317). Dr. Churchill noted that she continued to smoke although she was cutting down. (Tr. 317). His impression was: 1) Ischemic heart disease with recent inferior MI (myocardial infarction); and 2) Hyperlipidemia,[1] which was again under treatment. (Tr. 318).

On April 20, 2007, Plaintiff presented to the Washington Regional Medical Center. She did not remember falling, but remembered waking up and getting up with drool from the left side of her mouth, slurred speech, and weakness of the left arm and left leg. (Tr. 208). Plaintiff is left-hand dominant. She was in the hospital until May 7, 2007. While there, it was determined that Plaintiff had a stroke with left facial asymmetry. (Tr. 214). An echocardiogram revealed a mild apical left ventricular dysfunction, there was mitral stenosis and probable vegetation of the posterior leaflet of the mitral valve. (Tr. 219-220). The following procedures were performed on April 30, 2007, while Plaintiff was in the hospital:

1. Transesophageal echocardiogram

---

[1] Hyperlipidemia - A general term for elevated concentrations of any or all of the lipids in the plasma, such as hypertrighyceridemia, hypercholesterolemia, and so on. Dorland's Illustrated Medical Dictionary 903 (31st ed. 2007).

    2. Mitral valve replacement with a 27-mm Perimount bovine prosthesis.
    3. Coronary artery bypass graft to left anterior descending with left internal mammary artery.
    4. Swan-Ganz and arterial monitoring lines places.

(Tr. 223-225). A MRI of the brain revealed an acute infarct involving the right putamen[2] and corona radiata[3] and scattered nonspecific T2 hyperintensities within the supratentorial[4] white matter. (Tr. 247). Upon Plaintiff's discharge on May 7, 2007, the diagnosis was:

    1. Endocarditis.
    2. Cerebrovascular accident, related to embolic event.
    3. Possible vasculitis[5].
    4. Acute myocardial infarction.

(Tr. 205).

On May 24, 2007, an American College of Rheumatology Patient History Form was completed, wherein Plaintiff reported that she smoked in the past - one month ago. (Tr. 313). On that same day, Dr. Michael R. Saitta, at The Arthritis Center of the Ozarks, stated in a report that Plaintiff's BMD (bone mineral density) test measured at AP Spine L1-L4 revealed a value that fell within the range of osteopenia,[6] and that the fracture risk may be elevated depending on the presence of additional risk factors. (Tr. 304). A follow up bone density measurement in two years was recommended, or sooner if risk for bone loss was high. (Tr. 304).

---

[2] Putamen - The larger, darker and more lateral part of the lentiform nucleus, separated from the lateral globus pallidus by the lateral medullary lamina. Id. at 1581.

[3] Corona radiata - The radiating crown of projection fibers which pass from the internal capsule to every part of the cerebral cortex. Id. at 424

[4] Supratentorial - Superior to the tentorium of the cerebellum. Id. at 1833.

[5] Vasculitis - Inflammation of a blood or lymph vessel Id. at 2054.

[6] Osteopenia - Reduced bone mass due to a decrease in the rate of osteogenisis to the extent that there is insufficient compensation for normal bone lysis. The term is also used to refer to any decrease in bone mass below the normal. Id. at 1369.

On May 29, 2007, Plaintiff saw Dr. Larry D. Tuttle at FirstCare South. She expressed concern about: 1. Diabetes - she was experiencing foot problems. She became a diabetic in April while she was in the hospital and was taking 4 units of Novolog daily and Levemir, 10 units; 2. Cerebrovascular accident - was improved but she was also experiencing leg pain; 3. Pain in bilateral knee and radiation to right ankle; 4. Vasculitis - she was also experiencing CVA arthralgias; and 5. Elevated blood sugar - her sugars were under good control on Levemir and Novalog. (Tr. 324).

Over the period of the next several months, Plaintiff was treated by Dr. Tuttle at FirstCare South, Dr. Saiita, who practices rheumatology and internal medicine, Dr. Ryan Kaplan, a neurologist, and Dr. David Churchill, a cardiologist. (Tr. 300-303, 305-306, 315-316, 319-323, 332-334, 336, 344, 351-355, 368, 377, 380-383, 401-402).

A Disability Report by the Social Security Field Office dated June 1, 2007, reflected that Plaintiff communicated with the field officer by telephone, and the field officer noted that Plaintiff had no difficulty with anything except "Talking." (Tr. 122). The report stated that Plaintiff had a speech impediment, that she talked briskly and seemed to be anxious, and talked about several different issues at once. (Tr. 122). In a face-to-face interview between Plaintiff and a field officer on September 21, 2007, Plaintiff had difficulty with reading, seeing, and writing. (Tr. 167). Plaintiff had to remove her glasses to read the applications and sign the forms, and held the papers within 5 inches of her face when she reviewed the application. (Tr. 167).

On August 27, 2007, a Physical RFC Assessment form was completed by Jim Takach. (Tr. 292-299). Dr. Takach found that Plaintiff could: occasionally lift and/or carry 20 pounds;

frequently lift and/or carry 10 pounds; stand and/or walk about 6 hours in an 8 hour workday; sit about 6 hours in an 8 hour workday; and push and/or pull unlimited, other than as shown for lift and/or carry. (Tr. 293). He also found that she would be able to occasionally climb, balance, stoop, kneel, crouch and crawl. (Tr. 294). No manipulative, visual, or communicative limitations were noted, and he found that Plaintiff should avoid concentrated exposure to extreme cold and heat and hazards. (Tr. 295-296).

On February 1, 2008, Dr. Kaplan reported that eletrodiagnostic evidence suggested a very mild median mononeuropathy at the left wrist (as can be seen in carpal tunnel syndrome). (Tr. 336). Dr. Kaplan recommended a carpal tunnel wrist brace for Plaintiff to wear for the next several months. (Tr. 338, 340, 363). In a letter to Dr. Saitta dated February 1, 2008, Dr. Kaplan stated that the strength in Plaintiff's left upper and left lower limb was a "little bit" improved from her previous visit. (Tr. 338).

On April 24, 2008, Plaintiff advised her cardiologist, Dr. Churchill, that she was doing "good," and denied any chest discomfort, although she did get shortness of breath with severe exertion, such as running. (Tr. 355).

In a letter from Dr. Kaplan to Dr. Saiita dated January 13, 2009, after Plaintiff had moved back to Arkansas from Georgia, Dr. Kaplan stated that Plaintiff had been having some episodes of developing cold sweats and then collapsing. (Tr. 400). He was not sure what to make of this except that they "may potentially be seizures or additional strokes." (Tr. 400). Dr. Kaplan recommended an EEG and a repeat brain MRI, but Plaintiff did not have insurance, so she did not want to have them done. Dr. Kaplan gave her some Keppra to use to try and help the spells. (Tr. 400).

On January 13, 2009, Dr. Kaplan, Plaintiff's treating neurologist, completed a Physical RFC Assessment. (Tr. 396-399). In the assessment, Dr. Kaplan found that Plaintiff could never lift or carry, climb, balance, stoop, crouch, kneel, crawl, reach, handle, feel, push/pull, or hear, but could speak frequently. He also found that Plaintiff could sit 2 hours in an 8 hour workday, but not all at one time without interruption; and could stand and walk for 1 hour in an 8 hour workday, but none at one time without interruption. (Tr. 398). He stated that Plaintiff could frequently grasp and have fine manipulation with her right hand, but never do simple grasping or fine manipulation with her left hand. (Tr. 398). He also noted certain environmental restrictions - heights, moving machinery, noise, temperature extremes, fumes and vibrations, and found that Plaintiff's restrictions markedly limited Plaintiff's activities  (Tr. 399).

At the hearing held before the ALJ, Plaintiff stated that her impairments had kept her from being able to work a full-time job, and that she did not think her mind was the same "because I'm constantly forgetting things." (Tr. 39). She said that her husband had to tell her things two or three times. (Tr. 40). Plaintiff's husband testified that since Plaintiff's stroke, her balance and dexterity with her left hand was different, she was not very steady on her feet, she got confused easily and did not remember answers to questions that she asked him only a few minutes earlier. He stated that she repeated the same question often and that she occasionally fell - once every couple of weeks. (Tr. 42). He also stated that she became anxious easily, and did not have the confidence she used to have. (Tr. 43).

The ALJ expressed concern at the hearing that Dr. Kaplan's RFC assessment indicated that Plaintiff could not do anything at all, and that she believed Plaintiff had more skills than Dr. Kaplan indicated. (Tr. 46). The ALJ also indicated at the hearing that she might send Plaintiff

AO72A
(Rev. 8/82)

out for a "neuropsyche eval." (Tr. 46). However, such evaluation was not done, and with the aid of the testimony of the VE, found that Plaintiff would be able to return to her past work as a teacher. (Tr. 54).

**Applicable Law**

This Court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole. Ramirez v. Barnhart, 292 F. 3d 576, 583 (8th Cir. 2002). Substantial evidence is less than a preponderance but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision. The ALJ's decision must be affirmed if the record contains substantial evidence to support it. Edwards v. Barnhart, 314 F. 3d 964, 966 (8th Cir. 2003). As long as there is substantial evidence in the record that supports the Commissioner's decision, the Court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the Court would have decided the case differently. Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001). In other words, if after reviewing the record, it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, the decision of the ALJ must be affirmed. Young v. Apfel, 221 F. 3d 1065, 1068 (8th Cir. 2000).

It is well established that a claimant for Social Security disability benefits has the burden of proving her disability by establishing a physical or mental disability that has lasted at least one year and that prevents her from engaging in any substantial gainful activity. Pearsall v. Massanari, 274 F. 3d 1211, 1217 (8th Cir. 2001); see also 42 U.S.C. §§423(d)(1)(A), 1382c(a)(3)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by

medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§423(d)(3), 1382(3)(D). A plaintiff must show that her disability, not simply her impairment, has lasted for at least twelve consecutive months.

The Commissioner's regulations require him to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant had engaged in substantial gainful activity since filing her claim; (2) whether the claimant had a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) met or equaled an impairment in the listings; (4) whether the impairment(s) prevented the claimant from doing past relevant work; and, (5) whether the claimant was able to perform other work in the national economy given her age, education, and experience. See 20 C.F.R. §416.920. Only if the final stage is reached does the fact finder consider the Plaintiff's age, education, and work experience in light of her residual functional capacity (RFC). See McCoy v. Schweiker, 683 F.2d 1138, 1141-42 (8th Cir. 1982); 20 C.F.R. §416.920.

**Discussion**

The ALJ must fully and fairly develop the record as required by the Social Security Regulations. See 20 C.F.R. §404.1512. This can be done by re-contacting medical sources and by ordering additional consultative examinations, if necessary. Id. This responsibility is independent of Plaintiff's burden to press his case. Vossen v. Astrue, No. 09-1985, 2010 WL 2790934, at *4 (8th Cir. July 16, 2010)(the Eighth Circuit Court of Appeals remanded the matter for further development of claimant's RFC and the authenticity of the treating physician's report where the ALJ questioned the authenticity of the data and observations of a treating physician's assessment, and instead relied upon an assessment of a non-treating, non-examining physician)

quoting from Snead v. Barnhart, 360 F.3d 834, 838 (8th Cir. 2004).

In the present case, there is an absence of medical evidence to explain or dispute the testimony of the Plaintiff and her husband regarding Plaintiff's cognitive functions and her frequent falls, as well as the most recent concerns expressed by Dr. Kaplan regarding Plaintiff's potential seizures or additional strokes. Since said symptoms could affect Plaintiff's ability to function in the workplace, the Court finds it necessary to remand this matter to the ALJ to have Plaintiff examined and evaluated by a neuropsychologist in order to determine Plaintiff's cognitive functions and their impact on her ability to function in the workplace. The ALJ should also have Plaintiff submit to an EEG and brain MRI, and obtain another physical RFC assessment from an examining physician. The ALJ should thereafter re-evaluate Plaintiff's condition in light of the additional assessments.

**Conclusion**

Based upon the foregoing, the Court hereby reverses the decision of the ALJ and remands this matter to the Commissioner for further consideration pursuant to sentence four of 42 U.S.C. §405(g). On remand, the ALJ is directed to have Plaintiff examined and evaluated by a neuropsychologist in order to better determine Plaintiff's ability to function in the workplace. The ALJ should also have Plaintiff submit to an EEG and brain MRI, and have an examining physician submit a Physical RFC Assessment.

IT IS SO ORDERED this 21st day of July, 2010.

/s/ Erin L. Setser
HON. ERIN L. SETSER
UNITED STATES MAGISTRATE JUDGE